**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------X

                     :

**BIG APPLE TIRE, INC. ,**

                     :      **OPINION AND ORDER**

         **Plaintiff,**

                     :      **05 Civ. 8870 (SAS)**

     - against -

                     :

**TELESECTOR RESOURCES GROUP, INC.**
**d/b/a VERIZON SERVICES GROUP,**      :

         **Defendant.**         :
----------------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

       Big Apple Tire, Inc. ("Big Apple") is a fleet maintenance vendor

which, for a period of time, serviced vehicles owned by the Verizon operating

companies. Big Apple alleges that Telesector Resources Group, Inc. d/b/a

Verizon Services Group ("Verizon") discriminated against it on the basis of race

and/or color because Big Apple's President and Chief Executive Officer, Matthew

Brown, is African-American. Plaintiff's Third Amended Complaint, which alleges

discrimination in violation of 42 U.S.C. § 1981 ("section 1981"), seeks redress for

Verizon's discriminatory treatment, harassment and unlawful termination of its

2003 contract with Big Apple.[1] Verizon disavows any discriminatory conduct and

---

[1]     In its Memorandum of Law in Opposition to Defendant's Motion for
Summary Judgment ("Pl. Mem.") plaintiff withdrew its claims for breach of
contract and breach of the implied covenant of good faith and fair dealing. *See* Pl.

claims that it terminated its relationship with Big Apple solely based on poor performance. Verizon now brings a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure seeking to dismiss plaintiff's action in its entirety. For the following reasons, Verizon's motion is granted and this case is dismissed.

## I.     BACKGROUND

### A.     Verizon's Fleet Maintenance Operations

Telesector Resources Group is the  contracting entity responsible for the acquisition and purchasing of services and products for Verizon's operating companies.[2] Strategic Sourcing is a department within Telesector Resources Group that negotiates, awards, executes, administers, and terminates contracts with outside suppliers.[3] Walter Pylyp has been Verizon's Sourcing Manager since 1995.[4] Fleet Operations is the internal Verizon organization responsible for

---

Mem. at 25 n.14.

[2]     *See* Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment ("Def. Mem.") at 2.

[3]     *See id.* at 2-3.

[4]     *See* 4/20/06 Deposition of Walter Pylyp ("Pylyp Dep."), Ex. 12 to the Declaration of Kathleen L. McAchran in Support of Defendant's Motion for Summary Judgment ("McAchran Decl."), at 24.

2

approximately 53,000 vehicles located in approximately six hundred garages.[5]

Stategic Sourcing entered into agreements with suppliers, such as Big Apple, to provide vehicle maintenance and repair services to Fleet Operations.[6] These suppliers hired and supervised employees to manage Verizon's garages and were responsible for the completion of all repairs and maintenance work in a safe, timely, and cost-efficient manner.[7]  Although certain tools and equipment were provided by Verizon, suppliers typically provided their own mechanic handtools.[8] And while outside suppliers reported to first-level managers in Fleet Operations, Strategic Sourcing retained the responsibility for negotiating, awarding and terminating contracts.[9]

---

[5]     *See* Def. Mem. at 3 & n.5.

[6]     *See id.* at 3.

[7]     *See, e.g.,* Contract No. BQ 20185 (the "2003 Contract"), Ex. 2 to McAchran Decl., at 4 (WHEREAS Clauses).

[8]     *See, e.g., id.*, Attachment A ¶ 2 ("Supplier shall provide all labor and mechanic handtools required to perform services under this Agreement . . . ."); Contract No. BQ 010201 (the "2001Contract"), Ex. 1 to McAchran Decl., ¶ 10.0 ("You shall provide all labor, tools and equipment ('tools') used in providing Services.  If you use tools owned or rented by Verizon, the tools are provided 'as is' and it is your responsibility to inspect the tools to ensure that they are fit for use.").

[9]     *See* Def. Mem. at 3.

3

## B.     The 2001 Contract

Near the end of 2000, Brown met Pylyp and William Lescohier, both of whom are Caucasian, to discuss a potential business relationship between Big Apple and Verizon.[10]  After negotiating with Lescohier, Brown secured Big Apple's first fleet maintenance contract with Verizon in January 2001.[11]  Before giving the contract to Big Apple, Verizon considered bringing in its own mechanics to staff its garages.[12]  Pylyp and Lescohier provided Big Apple with this opportunity even though Big Apple was much smaller than the other vendors Verizon used, had no previous history with Verizon, and had no experience maintaining the type of sophisticated vehicles that made up part of Verizon's fleet, such as those with hydraulic equipment and aerial lifts.[13]

The 2001 Contract, in effect from January 2001 through December 2002, was a month-to-month contract for a twenty-four month period.[14]  Big Apple

---

[10]     *See* 4/11/06 Deposition of Matthew L. Brown ("Brown Dep. I"), Ex. 11 to McAchran Decl., at 246.

[11]     *See* Pylyp Dep. at 82 ("The person who actually signed the contract [Bill Lescohier] worked for me and he is the person who negotiated the contract with Mr. Brown.").

[12]     *See id.* at 88, 111.

[13]     *See* Brown Dep. I at 134-35.

[14]     *See* 2001 Contract ¶ 3.0.

was the only fleet maintenance vendor given a month-to-month contract; no other

fleet maintenance vendors were initially given month-to-month contracts.[15]

Verizon awarded this type of contract to Big Apple, in part, because it was not

sure Big Apple could perform satisfactorily.[16]  Brown complained to Lescohier

that a month-to-month contract made the employment and retention of high quality

mechanics difficult and that a definite term contract would ease these problems.[17]

Brown also asked Lescohier why Big Apple had to wait such a lengthy period of

time before it was awarded a definite term contract when others did not.[18]

        Under the 2001 Contract, Big Apple contracted to provide labor,

supervision, and fleet maintenance and repair services to approximately four

hundred vehicles located in three Staten Island garages located at: 180 Edgewater

Street, 2228 Arthur Kill Road, and 135 Johnson Street.[19]  Before signing the 2001

---

[15]     *See* Pylyp Dep. at 88-89; 4/24/06 Deposition of Carmen Stellato, Jr.,
Fleet Operations - Northeast Director ("Stellato Dep."), Ex. 13 to McAchran Decl.,
at 143.

[16]     *See* Pylyp Dep. at 88-89.

[17]     *See* Brown Dep. I at 108-10.

[18]     *See id.* at 113.

[19]     *See* 2003 Contract, Attachment D (listing 103 vehicles at Edgewater
Street, 110 vehicles at Johnson Street and 198 vehicles at Arthur Kill Road). The
number of vehicles serviced by Big Apple was considerably less than the number
of vehicles serviced by Verizon's other vendors. For example, Transerve serviced

5

Contract, Brown visited the garages at Edgewater Street and Arthur Kill Road but chose not to inspect the Johnson Street garage.[20]

The Contract gave Verizon the right to terminate prior to expiration, with or without cause, upon thirty days advance written notice to Big Apple.[21]  Big Apple completed its term under the 2001 Contract, although its performance was described by one Verizon employee as merely "okay."[22]

### C.    The 2003 Contract

Verizon eventually awarded Big Apple a five-year contract to take effect January 1, 2003.[23]  Under the 2003 Contract, Big Apple continued to service the Staten Island garages plus four additional garages (with approximately 355

---

approximately 3,000 vehicles at twenty garages located in Long Island.  Savvy, another vendor, was responsible for 3,000 to 5,000 vehicles at twenty garages located in Brooklyn.  A third vendor, Butler, was responsible for Manhattan, the Bronx and upstate New York and serviced approximately 7,000 to 8,000 vehicles and seventy garages.  At one time, Butler was responsible for 15,000 vehicles but its operations had been scaled down significantly.  *See* Stellato Dep. at 139-40, 149.

[20]    *See* Brown Dep. I at 55-56.

[21]    *See* 2001 Contract ¶ 3.0.

[22]    5/5/06 Deposition of Dominick Harrison ("Harrison Dep."), Ex. 14 to McAchran Decl., at 101-02.  Harrison is a Fleet Operations Manager and a Second Level Supervisor responsible for the Staten Island garages in 2003.

[23]    *See* 2003 Contract.

vehicles) located in Westchester County: 999 Nepperhan Avenue ("Yonkers"); 36 Beechwood Avenue ("New Rochelle"); 223 Marbledale Avenue ("Tuckahoe"); and 370 White Plains Road ("Eastchester").[24]  As with the 2001 Contract, Verizon could terminate the 2003 Contract without cause on thirty days written notice.[25]  In addition, the 2003 Contract expressly stated that "Verizon shall be the final authority for determining acceptable quality for the completed Services."[26]

Before signing the 2003 Contract, Brown did not negotiate any new or additional conditions or obligations, nor did he seek to change any provisions found in the original contract.  For example, Brown did not insist that the Johnson Street garage have a lift installed, nor did he insist on obtaining remote access to Verizon's fleet tracker system.[27]  Nor did Brown insist that Verizon provide new equipment, or a system for obtaining new equipment, even though he previously

---

[24]    *See id.*, Attachment D.

[25]    *See id.* ¶ 17.1 ("Verizon may, for any reason, elect to terminate this Agreement in whole or in part with respect to a particular geographic region, area/garage(s) and/or with respect to specific services.  Should Verizon elect to terminate this Agreement in its entirety or in part, Verizon shall provide Supplier with at least thirty (30) days advance written notice of said termination.").

[26]    *Id.* ¶ 6.2.

[27]    *See* 4/17/06 Deposition of Matthew L. Brown ("Brown Dep. II"), Ex. 11 to McAchran Decl., at 394.  In fact, Brown did not require that lifts be installed in any of the garages.  *See* Brown Dep. I at 204.

believed conditions at the Staten Island garages were unacceptable.[28]

### D.    Big Apple's Performance

Beginning in 2003, and over the course of several months, Verizon

had a series of meetings with Brown concerning various problems with Big

Apple's performance.[29]  For example, many vehicles remained out of service for

lengthy periods of time, excessive amounts were charged for repairs, and many

repairs were inadequate, thereby requiring repeat repairs.[30]  Then, at Stellato's

request, Verizon's Technical Services Audit Team audited the Arthur Kill Road,

Edgewater Street and Johnson garages in Staten Island and the Tuckahoe and

Yonkers facilities in Westchester County from June 25 to July 10, 2003.[31]

The Audit Team, which spent five days auditing the Staten Island and

Westchester garages, confirmed that Big Apple was improperly repairing

---

[28]    *See* Brown Dep. I at 204.

[29]    *See* Brown Dep. II at 629-30.

[30]    *See* 5/3/06 Deposition of David Williams ("Williams Dep."), Ex. 14
to McAchran Decl., at 208.  Williams is a Fleet Operations Manager and the
supervisor of Verizon's Staten Island and Westchester garages.

[31]    *See* 6/30/06 Declaration of Steven J. Babbitt, Fleet Operations
Specialist, in Support of Defendant's Motion for Summary Judgment ("Babbitt
Decl.") ¶ 6.  In early 2003, Verizon closed the Eastchester garage and transferred its
vehicles to the remaining three Westchester County garages. *See* Def. Mem. at 5
n.8.

vehicles.[32]  During the audit, the Audit Team randomly selected and inspected twenty-eight "in-service" vehicles which contained aerial lift equipment such as splice buckets.[33]  Of the twenty-eight inspected vehicles, the Audit Team placed twenty-six vehicles "out-of-service" for obvious safety defects.[34]  Although Big Apple recorded that it had inspected these vehicles, Babbitt stated that it should have noticed and repaired the defects if it had indeed conducted these inspections.[35]  Babbitt's written audit summaries of these inspections indicate that inadequate training was a major problem and that mechanics "seemed unaware of how to approach some of the defects presented to them during the audit."[36]  In addition to Big Apple's substandard or incomplete repair work and the problem with mechanic training, Big Apple also had problems with mechanic unavailability and incomplete paperwork.[37]

---

[32]     *See* Babbitt Decl. ¶ 6.

[33]     *See id.* ¶ 7. Verizon uses the term "in-service" to refer to vehicles that vendors have inspected and deemed usable and safe to drive. *See id.* ¶ 8.

[34]     *See id.* ¶ 9. "Out-of-service" refers to vehicles that have been deemed inoperable or unsafe to drive because of safety defects. *See id.* ¶ 8.

[35]     *See id.* ¶ 9.

[36]     *Id.*, Ex. 1.

[37]     *See id.* ¶ 11.

In a document authored by Brown, Big Apple acknowledged the

following "service inadequacies" identified by the Verizon audit:

- Poor performance by Big Apple Tire management and location supervisors in following up on the results of techs inspections, vehicle repair and paperwork.

- Incomplete vehicle inspections by the techs.

- Supervisors were not completely aware of techs' weaknesses or lack of knowledge in specific areas.

- Inadequate spot inspections by Big Apple Tire team members.[38]

Notes taken by Charles Allen, a Big Apple Team Leader, following meetings he

had with the Verizon Audit Team, substantiate Big Apple's poor performance.[39]

Big Apple's poor performance was also acknowledged by Nelson Perello, a Big

Apple Account Manager, in a memorandum to all Big Apple Associates dated July

---

[38]   Big Apple's July 21, 2003 Action Plan for Correction, Ex. 4 to McAchran Decl.

[39]   *See* 7/24/03 Notes relating to Staten Island/Arthur Kill et al., Ex. 5 to McAchran Decl. ("Donald said Jerry has been approving work that was not done or not done to satisfaction and he will no longer do so."); 7/22/03 Findings relating to Marbledale/Nepperhan, Ex. 6 to McAchran Decl. ("Martinez, realizing the degree of open tickets, verbalized his fear that this might be the next area the inspectors focus on during their next inspection to Mr. Perello and that they should try to correct this as soon as possible.").

3, 2003.[40]  Perello noted that Big Apple received a failing grade as a result of the

Verizon audit; that its paperwork was "disastrous;" and that employees would be

suspended and/or terminated for falsifying work records.[41]  Perello concluded that

Big Apple "must improve on **every facet** of [its] job duties in order to honor [its]

contract with Verizon."[42]

        In the months following the audit, Verizon met with Big Apple

repeatedly in an attempt to resolve its performance issues.[43]  For example, on

December 3, 2003, Williams met with Brown and Allen regarding repair costs per

vehicle.[44]  Williams noted that Big Apple was forty-two percent above its target

for September and that it "must show a sustainable downward trend" for Verizon

to continue doing business with Big Apple.[45]  Williams explained that without a

---

[40]     *See* Perello Memorandum, Ex. 3 to McAchran Decl.

[41]     *Id.*

[42]     *Id.* (emphasis in original).

[43]     *See* Brown Dep. II at 629-30 (Brown stating that he had "a series of
meetings with Verizon over many months concerning the performance of Big
Apple Tire and its employees"); Stellato Dep. at 366-67 ("I know that D.J.
[Harrison] and Dave [Williams] met weekly with the Big Apple field team, and I
know they both had conversations and meetings with Matt Brown . . . .").

[44]     *See* 12/3/03 Meeting Minutes, Ex. 7 to McAchran Decl.

[45]     *Id.*

solid plan to reduce the overall cost per vehicle, "Verizon will be forced to move in another direction which will not include Big Apple."[46]

Verizon also learned that Big Apple employees were reporting that vehicle repairs had been completed when, in fact, they had not.[47]  Brown, in discussions with Williams, acknowledged the seriousness of falsifying repair records.[48]  By January 2004, after repeated meetings and conversations, Big Apple still failed to meet Verizon's service and quality expectations.  Then, on January 23, 2004, Williams learned of another instance where a Big Apple employee falsified a repair record to show that work had been completed when, in fact, it had not been done.[49]  Williams informed Brown that he would no longer tolerate this conduct.[50]  Brown described Big Apple's misconduct in an internal

---

[46]     *Id.*

[47]     *See* Pylyp Dep. at 172-73.

[48]     *See* Brown Dep. II at 425-26, 439.

[49]     *See* 1/23/04 E-Mail from Williams to Big Apple, Ex. 8 to McAchran Decl. ("I have found another situation of a work order being closed out and completed and the vehicle sitting in the yard with a red O/S tag on it, waiting for parts.").

[50]     *See id.* ("I consider this falsifying of records and I will not tolerate this anymore.").

memorandum to Allen dated January 27, 2004.[51]  In that memorandum, Brown

acknowledged that the closing of work orders without completing the work was a

serious area of concern.[52]  Furthermore, Brown admitted that Big Apple is

"running a very loose ship" and that Verizon is not going to tolerate the sloppy

quality of work it is performing.[53]  Brown then implored his team to "turn this

around."[54]

   A number of Verizon employees ultimately concluded that Big

Apple's services were not acceptable.  For example, Williams concluded that Big

Apple's contract should be terminated when he discovered a second instance of

record falsification.[55]  By January 2004, Stellato was also ready to support the

recommendation that Verizon replace Big Apple.[56]  Pylyp explained, in his

---

[51] *See* 1/27/04 Memorandum, Ex. 9 to McAchran Decl.

[52] *See id.* ("Need to find out who is closing work orders with incomplete
work.").

[53] *Id.*

[54] *Id.* ("Let's turn this around!").

[55] *See* Williams Dep. at 226-27 ("When I found the second job closed
after Matt assured me that it wouldn't happen again and I found it closed again,
that the vehicle was still out of service, the job was closed as showing it to be
done, I had enough.").

[56] *See* Stellato Dep. at 387.

deposition, that a constellation of factors led to the termination of the 2003

Contract.

> The decision was based on much more than just a B report
> card issue.  It was much more towards integrity of the data
> that was being put into the computer.   There were
> allegations of work not being done.   There [were]
> allegations of work said was done [sic] and vehicle would
> be put into service, and then someone found out that it
> wasn't and we were dealing with possibly safety issues.
> So, it was not a question of a report card.  It is not here is
> B [sic], C three months in a row, you are fired.  That was
> not the issue.  It was much more serious than that . . . .[57]

Accordingly, on February 2, 2004, Verizon terminated its contract

with Big Apple pursuant to the "without cause" clause cause based, in part, on

Pylyp's recommendation.[58]  Because the termination notice was sent over an open

facsimile line, Big Apple employees saw the notice before Brown did.[59]  Pylyp

---

[57]     Pylyp Dep. at 172-73.

[58]     *See id.* at 172, 178 ("Throughout all of my career I like to cancel
contracts without cause."), 179 (" [O]nce a decision has been made to cut a
supplier, especially in this area, you want to do it as quickly as possible.").

[59]     *See* 2/2/04 Notice, Ex. K to the Affidavit of Michelle M. Le Roux
(plaintiff's counsel) in Opposition to Defendant's Motion for Summary Judgment
("Le Roux SJ Aff.") ("This serves as a 30 days notice for Termination Without
Cause, of our contract BAQ20185 (paragraph 17.1) . . . . ";  2/9/04 E-Mail From
Brown to Elaine Schwartz, Sourcing Process Leader, Ex. K to Le Roux SJ Aff.
("You faxed this notice to an 'open fax machine' on a day when I was out of the
office which allowed my employees to have prior notice of the termination **before
I did** – (this was not the best approach, the email and overnight were sufficient).").

14

was embarrassed that the notice was sent through an open fax line; he knew of no other vendor that was terminated is such a public manner.[60]  Stellato agreed that Verizon should not have faxed the termination notice; he, too, was unaware of any other vendor who was terminated in this fashion.[61]

### E.    Tools and Equipment

Throughout its relationship with Verizon, Big Apple repeatedly asked Verizon to provide  the tools and equipment necessary to perform effective fleet maintenance services, but they were never provided.[62]  Although the 2003 Contract stated that Big Apple "shall provide all labor and mechanic handtools required to perform services under this Agreement,"[63]  Big Apple claims that it did not have the type of  diagnostic, inspection and safety equipment that Verizon was responsible for supplying.[64]  For example, Allen repeatedly requested remote

---

[60]    *See* Pylyp Dep. at 271-73.

[61]    *See* Stellato Dep. at 429-30.

[62]    *See, e.g.,* 5/12/06 Deposition of Charles Edward Allen ("Allen Dep."), Big Apple Account Manager, Ex. A to the Affidavit of Michelle M. Le Roux in Opposition to Defendant's Motion to Strike ("Le Roux Strike Aff."), at 123-24.

[63]    2003 Contract, Attachment A ¶ 2.

[64]    *See* Allen Dep. at 92-94 (listing equipment not provided by Verizon as including "scanners for the on-board diagnostics," "simple GFI testers, the ground fault indicators," "torque wrenches," "safety helmets," and "safety

access to Fleet Tracker from Barry Lawrence, a Fleet Operations supervisor, Fleet Operations Manager Phil Tedesco, and Harrison, but never received it.[65] When Allen complained to Verizon about not having the necessary tools and equipment, Lawrence, retorted: "Hey, they only cost so-and-so, go down to the store and buy a couple. Matt is the black millionaire. Let him go buy them himself."[66] Allen viewed the failure to provide tools and equipment as racially discriminatory because of his personal observation that the Tenth Street garage, which was not serviced by a minority-owned fleet maintenance vendor, was better equipped.[67]

Big Apple also complained that the Staten Island garages were in poor condition. For example, because not all Staten Island garages had a lift, Big Apple technicians had to drive a vehicle that required a lift to repair it to a garage with a lift, repair it there, and then return it to the first garage.[68] This "taxi run" resulted in lost productivity because the work would otherwise have to be

---

harnesses.").

[65]     *See id.* at 63.

[66]     *Id.* at 95.

[67]     *See id.* at 103. The Tenth Street garage was serviced by Savvy. *See id.* at 72-73.

[68]     *See* Brown Dep. I at 151.

16

performed with portable floor jacks.[69]  When Brown complained about the absence

of lifts, he was repeatedly told that Verizon was "in the process of putting a lift

in."[70]  When Allen complained to Tedesco about the absence of lifts, Tedesco,

who is Caucasian, replied: "Hey, the white guys who ran the garages years ago

before you people ever got here, they were able to work on their backs.  Big Apple

Tire should be able to work on their backs too, so that's no excuse why the work

wasn't being done."[71]

        The allegation that Verizon failed to provide Big Apple with

necessary tools and equipment is supported by other evidence.  After the Verizon

audit, Babbitt drafted a set of initial recommendations, on his own initiative,

identifying areas where Big Apple needed improvement as well as some things

that Verizon could do to assist Big Apple.[72]  Under the section entitled

"Tools/Equipment," Babbitt noted that "[c]ontract mechanics didn't always have

the required tools and equipment available to perform necessary maintenance and

---

[69]       *See id.* at 152-53.

[70]       *Id.* at 57.  However, a lift was installed in the Johnson Street garage
only after Big Apple was terminated.  *See* Allen Dep. at 102-03.

[71]       Allen Dep. at 93.

[72]       *See* Babbitt Decl. ¶ 12.

17

repairs."[73]  The related recommendation was that "Verizon should develop a list of necessary tools and equipment required to perform maintenance and repairs" and that "[c]ontract management must assure that all required tools and equipment is [sic] available at all locations."[74]  With regard to training, Babbitt recommended that "all contract mechanics performing aerial maintenance and repair are adequately trained in repair and operation of the unit."[75]

After Babbitt prepared these draft recommendations, the Audit Team met with Big Apple and Verizon managers to discuss its findings.[76]  After those meetings concluded, Babbitt revised his draft recommendations "to reflect input by both Big Apple and Verizon during those meetings, highligh[t] outstanding issues, and include action items and target completion dates."[77]  The section "Tools/Equipment" of Babbitt's revised recommendations states: "A list detailing tools and equipment necessary to perform repairs and inspections for each facility

---

[73]     *Id. See also* 7/11/03 Draft Audit Recommendations (Bates No. TRGBAT 000123A), Ex. 2 to Babbitt Decl.

[74]     Babbitt Decl. ¶ 12.

[75]     *Id.*

[76]     *See id.* ¶ 13.

[77]     *Id.*

18

has been provided to [Verizon] and [Big Apple Tire].”[78]  There is no longer any

mention of training, nor of the requirement that Verizon ensure the availability of

all required tools and equipment at all locations.

### F.      Discriminatory Remarks

Big Apple claims that its employees were subject to racially

discriminatory remarks made by Verizon employees.  Allen reported that he

repeatedly heard Lawrence refer to Big Apple employees as “you people” and

state that it was his job “to get rid of you people.”[79]  Lawrence stopped making

these statements after Brown confronted him.[80]  Gari Sarni, a Fleet Operations

supervisor, cursed, used profanity, made derogatory comments, and yelled at Big

Apple’s black employees.[81]  For example, the first day Allen met Sarni, he heard

Sarni say “you fucking guys can’t do this right, you fucking guys can’t do that

right, goddam it, when are you going to do the shit like this, or you fucking people

---

[78]     *Id.  See also* 7/29/03 Revised Audit Recommendations (Bates No.
TRGBAT 001025), Ex. 2 to Babbitt Decl.

[79]     Allen Dep. at 80.

[80]     *See* Brown Dep. II at 511.  Michael H. Millegan, the highest-ranking
official in Fleet Operations throughout the relevant time period, conceded that the
use of the phrase “you people” could be an indicator of discrimination.  *See*
4/25/06 Deposition of Michael H. Millegan (“Millegan Dep.”), Ex. A to Le Roux
Strike Aff., at 248.

[81]     *See* Brown Dep. II at 532-33.

can't do anything right."[82]

### G.   Disparate Treatment

As stated earlier, Williams recommended termination of the 2003

Contract when he found out, for a second time, that a job order had been closed

when the vehicle was still out of service.[83]   But Williams had faced the problem of

record falsification in the past.   When Williams found that mechanics employed by

other vendors falsified records, he recommended that the mechanic be removed

from the Verizon account, not that the entire contract be terminated.[84]   For

example, Savvy committed fraud against Verizon by ordering almost $180,000 in

equipment.[85]   The mechanics involved in this fraud were removed, but the entire

contract was not terminated.[86]   Similarly, when a Big Apple mechanic tried to

---

[82]      Allen Dep. at 82.

[83]      *See* Williams Dep. at 226-27, 229 ("I spent a long time with Matt trying to help him succeed, so I was thoroughly frustrated.  His costs were going in the wrong direction.  The management wasn't taking care of the garages.  I was frustrated and I was ready to let it go, but when I'd seen that he didn't take any action with Charles Allen with the falsification of the records and it happened again, I knew that Matt didn't care.").

[84]      *See id.* at 219-20.  However, Williams testified that the first time he encountered falsification by management personnel was with Big Apple.  *See id.*

[85]      *See* 2003 Memorandum from Jack Berger, Ex. B to Le Roux SJ Aff.

[86]      *See id.*

order parts for his car using a fake vehicle number, he was removed while the

contract with Big Apple remained intact.  Lastly, Big Apple claims disparate

treatment in connection with lost garages.  Unlike Butler and Savvy, Big Apple

was terminated from all the garages it serviced under the  2003 Contract.  In

contrast, Butler and Savvy, both of whom lost garages where they performed

poorly, continued to service those garages in which they were performing well.[87]

## II.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is appropriate if the record "show[s] that there is

no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."[88]  "A genuine factual issue derives from the

'evidence [being] such that a reasonable jury could return a verdict for the

nonmoving party.'"[89]  "A fact is 'material' for these purposes when it 'might affect

---

[87]    *See* Millegan Dep. at 35-36.  However, Millegan testified that
Verizon was forced to maintain relationships with Butler and Savvy because of
their size. *See id.* at 36.

[88]    Fed. R. Civ. P. 56(c).

[89]    *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting
*Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)) (alteration in original).
*Accord Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).

the outcome of the suit under the governing law.'"[90]  The movant has the burden

of demonstrating that no genuine issue of material fact exists.[91]

In turn, to defeat a motion for summary judgment, the non-moving

party must raise a genuine issue of material fact that does "'not rely on conclusory

allegations or unsubstantiated speculation.'"[92]  "The nonmoving party cannot

defeat summary judgment by 'simply show[ing] that there is some metaphysical

doubt as to the material facts.'"[93]  In determining whether a genuine issue of

material fact exists, the court must construe the evidence in the light most

favorable to the non-moving party and draw all justifiable inferences in that

party's favor.[94]

"'[T]he salutary purposes of summary judgment -- avoiding

protracted, expensive and harassing trials -- apply no less to discrimination cases

---

[90]     *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005)
(quoting *Anderson*, 477 U.S. at 248).

[91]     *See id.* (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157
(1970)).

[92]     *Id.* at 554 (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d
423, 428 (2d Cir. 2001)).

[93]     *McClellan*, 439 F.3d at 144 (quoting *Matsushita Elec. Indus. Co. v.
Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (alteration in original).

[94]     *See Golden Pac. Bancorp v. FDIC*, 375 F.3d 196, 201 (2d Cir. 2004).

than to . . . other areas of litigation.'"[95]  "Courts within the Second Circuit have

not hesitated to grant defendants summary judgment in such cases where . . .

plaintiff has offered little or no evidence of discrimination."[96]  Indeed, "'[i]t is

now beyond cavil that summary judgment may be appropriate even in the

fact-intensive context of discrimination cases.'"[97]

However, "[m]ore caution should be exercised in affirming the grant

of summary judgment in a discrimination case because 'smoking gun' evidence of

discriminatory intent is rare and most often must be inferred."[98]

> "Since it is rare indeed to find . . . proof that a . . . decision
> was made for a discriminatory reason, whatever other
> relevant depositions, affidavits and materials are before the
> district court must be carefully scrutinized for

---

[95]    *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.
2001) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

[96]    *Alphonse v. State of Connecticut Dep't of Admin. Servs.*, No.
Civ.3:02CV1195, 2004 WL 904076, at *7 (D. Conn. Apr. 21, 2004) (quotation
marks and citation omitted).

[97]    *Feingold v. New* York, 366 F.3d 138, 149 (2d Cir. 2004) (quoting
*Abdu-Brisson*, 239 F.3d at 466) (alteration in original).

[98]    *Forsyth v. Federation Employment and Guidance Serv.*, 409 F.3d
565, 569 (2d Cir. 2005) (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d
Cir. 2001)). *Accord Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999)
("[T]he trial court must be especially cautious in deciding whether to grant this
drastic provisional remedy in a discrimination case, because the [defendant's]
intent is often at issue and careful scrutiny may reveal circumstantial evidence
supporting an inference of discrimination.").

circumstantial evidence that could support an inference of discrimination."[99]

But "'[e]ven in the discrimination context, a plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment.'"[100]  "'[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment.'"[101]

### B.    Section 1981

Section 1981 prohibits intentional race discrimination affecting "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship."[102]  "A plaintiff asserting a claim under § 1981 must prove (1) [he is]

---

[99]    *Weinstock v. Columbia Univ.*, 224 F.3d 33, 57 (2d Cir. 2000) (quoting *Chertkova v. Connecticut Gen'l Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir. 1996)).

[100]    *Flakowicz v. Raffi Custom Photo Lab, Inc.*, No. 02 Civ. 9558, 2004 WL 2049220, at *8 (S.D.N.Y. Sept. 13, 2004) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)).

[101]    *Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 94 (2d Cir. 2003) (quoting *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996) (alteration in original)).  *Accord Cameron v. Community Aid for Retarded Children, Inc.*, 335 F.3d 60, 63 (2d Cir. 2003) ("'[P]urely conclusory allegations of discrimination, absent any concrete particulars,' are insufficient" to satisfy an employee's burden on a motion for summary judgment.) (quoting *Meiri*, 759 F.2d at 998) (alteration in original).

[102]    42 U.S.C. § 1981(b).

24

a member of a racial minority; (2) defendants' intent to discriminate on the basis

of race; and (3) discrimination concerning one of the statute's enumerated

activities."[103]  When considering the second requirement, a plaintiff may use any

evidence that logically supports an inference of discrimination because defendants

who discriminate are unlike to leave a "smoking gun" exposing their

discriminatory animus.[104]

   Where there is no direct evidence of discrimination, courts apply the

traditional burden-shifting analysis developed by the Supreme Court in Title VII

cases.[105]  Under the *McDonnell Douglas* framework, a plaintiff must first prove a

---

[103] *Brown v. Oneonta*, 221 F.3d 329, 339 (2d Cir. 1999). *Accord General Bldg. Contractors Ass'n Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1981) (stating that section 1981 requires proof of purposeful discrimination).

[104] *See Bickerstaff v. Vassar College*, 196 F.3d 435, 448 (2d Cir. 1999) ("Employers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law.") (quotation marks and citation omitted).

[105] *See McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997). *See also Cruse v. G & J USA Publ'g*, 96 F. Supp. 2d 320, 325 (S.D.N.Y. 2000) ("Because plaintiff has not offered any direct evidence of discrimination, her claim . . . must proceed under the three-step burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-08 (1993).") (parallel citations omitted)).

25

prima facie case of discrimination.[106]  If the plaintiff meets this burden, the

defendant must produce evidence that the allegedly discriminatory actions "were

taken 'for a legitimate, nondiscriminatory reason.'"[107]  If a defendant produces

such evidence, "the presumption raised by the prima facie case is rebutted, and

drops from the case."[108]  Plaintiff retains the ultimate burden of proving that

defendant's reasons were merely a pretext for discrimination.[109]

## III.   DISCUSSION

### A.   The 2001 Contract

#### 1.   Timeliness

In its Third Amended Complaint, dated May 12, 2006, Big Apple

alleges that the terms of the 2001 Contract were discriminatory because it was a

month-to-month contract which no Caucasian-owned fleet maintenance vendor

was forced to accept.  Verizon argues that this "claim" -- which was not raised

---

[106]    *See McDonnell Douglas*, 411 U.S. at 802.  Courts have held that a
plaintiff will survive summary judgment if its prima facie case meets a *de minimis*
burden.  *See Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

[107]    *Hicks*, 509 U.S. at 506-07 (quoting *Texas Dep't of Cmty. Affairs v.
Burdine*, 450 U.S. 248, 254 (1981)).

[108]    *Id.* at 507.

[109]    *See McDonnell Douglas*, 411 U.S. at 804.

until 2006, over five years after the 2001 Contract was executed -- is time-barred

by operation of the three-year statute of limitations applicable to claims of

discrimination in the formation of a contract. Although Verizon is correct that any

cause of action relating to the 2001 Contract is untimely, the circumstances

surrounding the 2001 Contract may provide evidence of an overall pattern of

discrimination by Verizon.[110] Proving such a pattern could possibly support a

separate and actionable claim of discrimination, *i.e.*, wrongful termination of the

2003 Contract. The admission of relevant evidence is not curtailed by any statute

of limitations. Accordingly, the circumstances surrounding the 2001 Contract will

be considered in support of Big Apple's claim that Verizon unlawfully terminated

the 2003 Contract.

### 2.    Evidence of Discrimination

Plaintiff's basis for claiming that the 2001 Contract was

discriminatory is that Brown is not aware of any other fleet maintenance vendor

who was given a similar month-to-month contract at the start of its relationship

with Verizon. This fact, standing alone, is insufficient to establish a prima facie

---

[110]    Big Apple has not brought a breach of contract claim relating to the
2001 Contract, nor could it given that the 2001 Contract was not terminated prior
to its expiration date. To the extent that Big Apple asserts any claim of
discrimination relating to the 2001 Contract, such claims are dismissed as time-
barred.

case of discrimination because plaintiff cannot show that it was similarly situated
to any non-minority vendor who was given a longer contract. Plaintiff conceded
that at the time it was awarded the 2001 Contract, Big Apple had no history with
Verizon and no experience in servicing some of the sophisticated vehicles owned
by Verizon. The other fleet maintenance vendors with whom Big Apple compares
itself, Butler and Savvy, were far larger than Big Apple and had long-established
relationships with Verizon.[111]   Moreover, Verizon was considering bringing in its
own mechanics to staff the Staten Island garages and was therefore looking for an
outside vendor on a short-term basis only. Absent a showing that a Caucasian-
owned vendor with a similar lack of experience, in a similar temporary situation,
was given something other than a month-to-month contract, the terms of the 2001
Contract do not evidence any race discrimination by Verizon.[112]

---

[111]    Butler was a well-established fleet maintenance company which had a
long-standing, fixed fee contract to maintain the majority of Verizon's fleet in the
Northeast beginning in 1996. Savvy, who was recommended by an employee in
Verizon's Sourcing Department, also had prior relevant experience in
sophisticated fleet maintenance before entering its original contracts with Verizon.

[112]    *Cf. Ford v. Consolidated Edison Co. of New York*, No. 03 Civ. 9587,
2006 WL 538116, at *17 (S.D.N.Y. Mar. 3, 2006) ("Absent concrete, admissible
evidence that similarly situated non-African-American employees were treated
differently under identical circumstances, Plaintiff's discrimination claims must
fail.").

28

## B.   Lack of Equipment

Brown admits that he was aware of the condition of the Staten Island garages before entering the 2001 Contract and that he never requested that Verizon provide any additional tools or equipment when he entered into the 2003 Contract.  Thus, Big Apple does not assert that Verizon was contractually obligated to provide a lift at every garage, remote access to Fleet Tracker, or any other equipment that Big Apple was allegedly denied.  Rather, Big Apple attempts to excuse its own poor performance by complaining that Verizon should have provided it with better tools and equipment.  However, there is no evidence that Verizon's alleged failure to provide tools and equipment, or remote access to Fleet Tracker, had anything to do with race.[113]  To prove discrimination, Big Apple must do more than disagree with Verizon's business decisions.[114]

---

[113]   Allen's claim that other Verizon garages run by white-owned fleet maintenance vendors were better equipped is conclusory and speculative given that it was based on a single visit to a single garage managed by Savvy.

[114]   *See, e.g., Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988) (holding that, as a matter of law, an employee's disagreement with an employer's business decision is insufficient to prove discriminatory conduct); *Foxworth v. American Bible Soc'y*, No. 03 Civ. 3005, 2005 WL 1837504, at *7 (S.D.N.Y. July 28, 2005) ("Businesses routinely make decisions about the appropriate allocation, or reallocation, of their resources, expanding some enterprises while reducing others, and such business judgments do not invariably provide evidence of discriminatory intent."), *aff'd*, 2006 WL 1359931 (2d Cir. May 16, 2006).

29

## C.  Discriminatory Remarks

In an attempt to bolster its discriminatory termination claim, Big Apple has added allegations of racial harassment in violation of section 1981.  But Big Apple has failed to establish the essential elements of such a claim.  Big Apple has not alleged a single epithet, slur or remark that is racially derogatory on its face.  The remarks in issue include Tedesco's statement that white guys could work on their backs, Lawrence's reference to Brown as a black millionaire and his reference to Big Apple employees as "you people,"[115] and Sarni's reference to Big Apple employees as "you fucking guys."  Such racially-ambiguous, sporadic remarks made by non-decision makers are insufficient evidence of race discrimination or harassment.[116]

---

[115]    Although Verizon cites *Griffin v. Ambika Corp.*, 103 F. Supp. 2d 297, 314 (S.D.N.Y. 2000) for the proposition that the phrase "you people" cannot be deemed inherently racially offensive, Big Apple points out that when this term is directed toward African-American individuals, it is, in fact, indicative of racial animosity.  *See Wooten v. Reconstruction Home, Inc.*, No. 5:02-CV-01278, 2005 WL 1502149, at *11 (N.D.N.Y. June 24, 2005).

[116]    *See Curtis v. Airborne Freight Corp.*, 87 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) ("'For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that [i]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments.'" (quoting *Schwapp*, 118 F.3d at 110 (quotation marks and citations omitted) (alteration in original)).

Even if these remarks present some evidence of racial animus, they fall far short of the "steady barrage of opprobrious racial comments" necessary as a matter of law to create a hostile work environment.[117]  Presented with allegations far more egregious than those raised here, courts have routinely dismissed hostile work environment claims finding that the alleged harassment is not severe or pervasive.[118]  Big Apple's reference to four remarks uttered in a garage environment, none of which are derogatory on their face, comes nowhere near the level required to sustain a claim of racial discrimination under section 1981. Whether or not the owner or managers of Big Apple found these comments made by non-decisionmakers to be rude is immaterial.[119]  Furthermore, Brown admits

---

[117]    *Id.*

[118]    *See, e.g., Hannon v. Wilson Greatbach, Ltd.*, No. 00-CV-0203E(F), 2002 WL 1012971, at *9 (W.D.N.Y. Apr. 24, 2002) (multiple uses of the word "nigger"); *Arroyo v. WestLB Admin., Inc.*, 54 F. Supp. 2d 224, 230-31 (S.D.N.Y. 1999) (five to six incidents of racial slurs, including "fucking spic," over a two-year period); *Brown v. Middaugh*, 41 F. Supp. 2d 172, 187-88 (N.D.N.Y. 1999) (references to "nigger," "lazy nigger," "piece of shit nigger," and "good for nothing nigger"); *Bolden v. New York City Hous. Auth.*, No. 96 Civ. 2835, 1997 WL 666236, at *2 (S.D.N.Y. Oct. 27, 1997) (five "nigger" references over a six-week period).

[119]    *See Beverly v. 1115 Health & Benefits Fund*, 420 F. Supp. 2d 47, 60 (E.D.N.Y. 2005) (supervisor's rude behavior was "insufficient to support a jury finding of a materially adverse change in the terms and conditions of employment"). *See also* Shira A. Scheindlin & John Elofson, *Judges, Juries, And Sexual Harassment*, 17 Yale L. & Pol'y Rev. 813, 846-47 & n.209 (citing

31

that the only comments of which he was aware stopped after his discussions with

Harrison and Lawrence. Big Apple cannot defeat summary judgment by relying

on conduct which ceased after it was reported.[120] In sum, the alleged

discriminatory comments cited by Big Apple are insufficient as a matter of law to

establish a hostile work environment.

### D.   Disparate Treatment

In terminating the 2003 Contract, Verizon treated Big Apple exactly

as it had treated its prior, Caucasian-owned vendors. For example, Butler was

---

*Grossman v. Gap, Inc.*, No. 96 Civ. 7063, 1998 WL 142143, at *5 (S.D.N.Y. Mar. 25, 1998) (holding a single inappropriate comment insufficient as a matter of law to survive summary judgment); *Polimeni v. American Airlines*, No. CV 92-5702, 1996 WL 743351, at *2 (E.D.N.Y. Dec. 18, 1996) (holding that three incidents of lewd comments and inappropriate touching over two years were insufficient evidence to survive a motion for summary judgment); *Gonzalez v. Kahan*, No. CV 88-922, 1996 WL 705320, at *3-4 (E.D.N.Y. Nov. 25, 1996) (finding that one obscene phone call, a bear hug, several requests for a date, and a marriage proposal were insufficient evidence to establish a hostile work environment claim); *Rivera v. Edenwald Contracting Co.*, No. 93 Civ. 8582, 1996 WL 240003 at * 6 (S.D.N.Y. May 9, 1996) (holding that two vulgar comments made by different coworkers were not enough to establish that a workplace was permeated with discrimination); *Ricard v. Kraft Gen. Foods*, No. 92 Civ. 2256, 1993 WL 385129, at *3 (S.D.N.Y. Mar. 16, 1993), *aff'd*, 17 F.3d 1426 (2d Cir. 1994) (finding that four sexually-oriented incidents were insufficient evidence as a matter of law to survive summary judgment)).

[120]   *See Kearney v. Pyramid Mgmt. Group, Inc.*, No. 98-CV-0531E(SC), 2000 WL 744000, at *16 (W.D.N.Y. June 5, 2000) (granting summary judgment, in part, where racist graffiti stopped after employee reported it to his supervisor).

removed from its Westchester garages when Verizon became dissatisfied with

Butler's costs and performance at those garages. Similarly, Savvy's management

of its Staten Island garages ended when Verizon became dissatisfied with its

performance. Plaintiff takes issue with the fact that it lost all six of its garages

when the 2003 Contract was terminated, in contrast to Butler and Savvy, both of

whom retained some garages after losing others. This, however, was a function of

their much larger size rather than race.[121]

The same is true of the charged falsification. The fact that Savvy

mechanics were fired for fraudulently ordering parts does not establish that Savvy

was "similarly situated" to Big Apple with respect to the termination of its

contract.[122] Big Apple's falsification of records, which designated repairs as

"completed" when in reality no repairs had been done, went to the very core of its

obligation to properly and safely maintain vehicles. Moreover, Big Apple's

--------

[121]    Verizon phased out Butler's services over time due to the number of
garages that Butler managed and the difficulty associated with replacing Butler at
one time. *See* Pylyp Dep. at 161-62.

[122]    *See Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 464 (S.D.N.Y.
2006) (to be similarly situated, there must be similar conduct without
differentiating or mitigating circumstances); *Bennett v. Watson Wyatt & Co.*, 136
F. Supp. 2d 236, 249-50 (S.D.N.Y. 2001) ("Employees are not similarly situated
merely because their conduct might be analogized . . . [they] must have engaged in
conduct similar to plaintiff's without such differentiating or mitigating
circumstances that would distinguish their conduct or the appropriate discipline.").

falsification of records involved Big Apple's management, affected all of its garages, and was not remedied after being raised by Verizon. In contrast, there is no evidence that Savvy management was involved in, or even aware of, the fraudulent ordering of parts in one of the twenty garages it managed; the conduct did not affect the condition of the vehicles; and Savvy was performing well otherwise. Finally, when Verizon discovered that a Big Apple mechanic fraudulently ordered parts, it took the same action as it did with Savvy – it removed the  mechanic from Verizon's account but did not terminate the contract.

### E.    Verizon's Legitimate Non-Discriminatory Reasons

Given the complete absence of proof that Verizon intentionally discriminated against Big Apple on the basis of Brown's race and/or color, plaintiff has failed to establish a prima facie case of discrimination.[123]  Even if it had established a prima facie case, Verizon has articulated legitimate, non-discriminatory reasons for terminating the 2003 Contract.  Specifically, Big

---

[123]    "To establish a claim under § 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.)." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993).  While plaintiff satisfied the first and third prongs, it has failed to offer any evidence of Verizon's discriminatory intent, thereby failing the second prong.

Apple's failure to perform satisfactorily, which is confirmed by Big Apple's own

documents, is sufficient reason for the termination.  When coupled with Big

Apple's repeated falsification of documents, there is overwhelming evidence

establishing Verizon's legitimate, non-discriminatory reasons for terminating the

2003 Contract.

In light of this evidence, the only way plaintiff could survive

summary judgment would be to offer admissible evidence that Verizon's reasons

for termination were pretextual.[124]  Despite plaintiff's attempts, it has failed to do

so.  Plaintiff has tried to show pretext by suggesting that the July 2003 audit

actually showed that Verizon, not Big Apple, was responsible for all of Big

---

[124]    "[T]he plaintiff - once the employer produces sufficient evidence to
support a nondiscriminatory explanation for its decision - must be afforded the
'opportunity to prove by a preponderance of the evidence that the legitimate
reasons offered by the defendant were not its true reasons, but were a pretext for
discrimination.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143
(2000) (quoting *Burdine*, 450 U.S. at 253).  Pretext may be established "'directly
by persuading the court that a discriminatory reason more likely motivated the
employer or indirectly by showing that the employer's proffered explanation is
unworthy of credence.'" *Jetter v. Knothe Corp.*, 324 F.3d 73, 77 (2d Cir. 2003)
(quoting *Burdine*, 450 U.S. at 256).  "Where multiple reasons are advanced, the
plaintiff must show that each reason was a pretext." *Bojd v. Golder Assocs., Inc.*,
No. 06-12209, 2006 WL 3780645, at *1 (11th Cir. Dec. 26, 2006) (citing
*Chapman v. AI Transport*, 229 F.3d 1012, 1037 (11th Cir. 2000) (en banc)).
Moreover, "[a] reason is not pretext for discrimination 'unless it is shown *both* that
the reason was false, *and* that discrimination was the real reason.'" *Brooks v.
County Comm'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006)
(quoting *Hicks*, 509 U.S. at 515) (emphasis in original).

Apple's performance problems. Specifically, Big Apple argues that it has shown

nefarious intent on Verizon's part because Babbitt's draft set of recommendations

reflected more action items for Verizon than did a later modification of that

document. This theory is untenable. Babbitt revised his draft recommendations to

reflect additional input from both Big Apple and Verizon managers during later

meetings. There is absolutely no proof that either race or any intent to favor

Verizon or discredit Big Apple played a part in his revisions. Plaintiff's argument

to the contrary is pure speculation which cannot defeat summary judgment.[125]

        Furthermore, because plaintiff may have realized that it could not

show that similarly situated white-owned fleet maintenance vendors were treated

more favorably than it was, plaintiff also resorts to an elaborate conspiracy theory.

According to Big Apple, discriminatory intent can be inferred from the fact that

certain African-American executives at Verizon were not informed of and did not

participate in the decision to terminate Big Apple. This conspiracy theory is

belied by the fact that Ralph Mayfield, the African-American executive

---

[125]    *See Harper v. National Kidney Found., Inc.*, No. 03-CV-6247L, 2005
WL 43774, at *10 (W.D.N.Y. Jan. 10, 2005) (granting summary judgment
dismissing employee's section 1981 claims despite her unsubstantiated allegations
that she was "set up" for termination and that documentation submitted in support
of defendant's motion was created "after-the-fact in order to cover up
discriminatory conduct").

responsible for Fleet Operations at the time Big Apple was terminated, approved

the decision to terminate Big Apple.[126]   Accordingly, plaintiff has failed to show

that the reasons put forth by Verizon for terminating the 2003 Contract were a

pretext and that race discrimination was the real reason for the termination.

Without a showing of pretext, Verizon's legitimate, non-discriminatory reasons for

terminating its relationship with Big Apple adequately support the dismissal of

plaintiff's case on summary judgment.

## IV.   CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment

is granted and this case is dismissed.  The Clerk of the Court is directed to close

this motion [Document # 32] and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            February 13, 2007

---

[126]      *See* 5/10/06 Deposition of Ralph Mayfield, Ex. 16 to the
Supplemental Declaration of Kathleen L. McAchran in Further Support of
Defendant's Motion for Summary Judgment, at 46-47.

## - Appearances -

.                                                            .

**For Plaintiff:**

Kenneth P. Thomson, Esq.
Michelle le Roux, Esq.
Thompson Wigdor & Gilly LLP
350 Fifth Avenue, Suite 5720
New York, New York 10118
(212) 239-9292

Derek Sells, Esq.
Tracey L. Brown, Esq.
The Cochran Firm
The Woolworth Building
233 Broadway, 5th Floor
New York, New York 10279
(212) 553-9215

**For Defendant:**

Willis J. Goldsmith, Esq.
Kathleen L. McAchran, Esq.
Vicki R. Walcott-Edim, Esq.
Jones Day
222 East 41st Street
New York, New York 10017
(212) 326-3939